## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 16 2020, 11:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven R. Knecht
Vonderheide & Knecht
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Robert J. Henke
Marjorie Lawyer-Smith
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of N.H. and K.M. (Children) and:

A.M. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

June 16, 2020

Court of Appeals Case No.
19A-JT-3004

Appeal from the Tippecanoe Superior Court

The Honorable Matthew Boulac, Judge Pro Tempore

Trial Court Cause No.
79D03-1812-JT-163 & 79D03-1812-JT-164

**Riley, Judge.**

# STATEMENT OF THE CASE

[1] Appellant-Respondent, A.M. (Mother), appeals the trial court's termination of her parental rights to her minor children, N.H. and K.M. (Children).

[2] We affirm.

# ISSUE

[3] Mother presents one issue on appeal, which we restate as: Whether the trial court's Order terminating Mother's parental rights was supported by clear and convincing evidence.

# FACTS AND PROCEDURAL HISTORY

[4] N.H. was born in August 2015 and K.M. was born in April 2017.[1] Mother received no prenatal care while pregnant with K.M. K.M. was then born prematurely and immediately admitted into the NICU. On May 5, 2017, the Tippecanoe County Department of Child Services (DCS) responded to a report that Mother was inadequately caring for K.M. On the same day, DCS visited Mother's home. During the visit, DCS observed Mother holding K.M. inappropriately. Mother also told DCS that a week prior to the report, mother's

---

[1] K.M.'s biological father's parental rights were terminated, and he does not participate in this appeal. N.H.'s biological father remains unknown.

mother, Grandmother, had to revive K.M. after he stopped breathing and turned blue and limp. Mother did not seek medical attention until the next day. Mother admitted having been diagnosed with bipolar disorder, multiple personality disorder, schizophrenia, ADHD, depression, and mild mental retardation. Mother reported that her mental disorders, except schizophrenia, were diagnosed when she was five years old, and that her schizophrenia was attributed to the fact that she was a recovering drug addict. Mother added that she also experiences visual hallucinations such as seeing spiders and faces, and that the last episode was a month prior to the DCS report. Mother claimed that she did not "need psychological counseling, or medication[]," and that her disorders could be controlled within her mind and medications were not necessary. (Exh. Vol. I, p. 11). Mother also admitted using alcohol, marijuana, pills, and cocaine as well as experimenting with methamphetamine and heroin in the past.

[5] Following the visit, DCS removed the Children from Mother's home and placed them in foster care. On May 7, 2017, DCS filed petitions alleging the Children were Children in Need of Services (CHINS) due to allegations of neglect or abuse. On June 21, 2017, the trial court adjudicated Children to be CHINS. A dispositional order was issued on July 19, 2017, where Mother was ordered to participate in case management, random drug screens, a mental health assessment, a substance abuse assessment, a psychological assessment, and supervised visits with Children.

[6]     Both Children have special needs.  N.H. has problems with aggression, developmental delays, and possible fetal alcohol syndrome.  N.H. also attends speech, feeding, and behavioral therapy.  As for K.M., he was diagnosed with failure to thrive and struggled to gain weight.  K.M. underwent surgery and a "G-Tube" was inserted in abdomen to ensure that he was receiving enough calories.  (Appellant's App. Vol. II, p. 28).  Due to the G-Tube, K.M. had dietary restrictions, and Mother was required to participate in training on how to feed K.M.  Mother did not understand or retain enough information from those training sessions to properly feed K.M.  On other occasions, Mother disregarded K.M.'s dietary restrictions and would try to feed him solids, insisting "that's what he needed at the time."  (Transcript Vol. II p, 133).

[7]     In September 2017, Mother underwent a mental health assessment due to her untreated mental health conditions.  The clinician noted that "it would be difficult for [Mother] to safely parent her children with untreated mental health disorders."  (Exh. Vol. I, p. 218).  Mother was unsure why the DCS became involved in the first place, and the clinician noted that Mother appeared to "parrot" information regarding K.M.'s health condition.  (Exh. Vol. I, p. 217).  In November 2017, Mother completed a parenting/family functional assessment.  It was reported that Mother's mental health issues affected her ability to parent the Children.  The clinician expressed concern that Mother may always need extra support in parenting the Children and that her mental health could greatly impact her ability to parent appropriately.

[8] When the CHINS case began, Mother had secure housing, however, around February 2018, Mother was threatened with an eviction for having a pet and for allowing other people to live in her apartment, which were violations of her subsidized housing rules. Mother's boyfriend, who had failed a DCS drug screen, was living in Mother's home.

[9] Around June 2018, Mother became increasingly confrontational and aggressive toward her service providers. In July 2018, Mother was discharged from case management. Mother claimed that she did not need any assistance with organization despite the clutter in her home. Services were stopped with two different case management providers because of Mother's aggressive behavior, including shouting and cussing at the case managers.

[10] In August 2018, a second visit facilitator for parenting time sessions was added to ensure adequate supervision during Mother's supervised visits. After Mother appeared to struggle with the needs of both Children at the same time, Mother's visits were individualized for each child. Even with the separate supervised visits, Mother struggled to understand the Children's individual medical concerns.

[11] In December 2018, Mother completed a psychological assessment. Mother's "cognitive and personality testing" were "suggestive of someone who is easily frustrated and overwhelmed." (Exh. Vol. I, p. 194). Mother was also found to have a hard time realistically appraising her strengths and weaknesses and she lacked sufficient awareness and empathy for the needs of others. Those

findings were of "potential concern when it comes to her ability to consistently manage the practical demands of raising two small children while balancing her own needs with those of the children as well." (Exh. Vol. I, p. 194).

[12] In December 2018, DCS filed termination petitions and an evidentiary hearing was conducted on February 20 and May 1, 2019. The Children had been out of Mother's care since their initial removal in May 2017. At the time of the termination hearing, Mother had been discharged from visitation services due to safety concerns for the Children and her inability to appropriately care for them. DCS concluded that it was traumatizing for them to continue visits since Mother disregarded the specific doctor's orders regarding K.M.'s feedings and she would try to feed him solids, insisting "that's what he needed at the time." (Tr. Vol. II p, 133). In addition, the Children displayed behavioral issues after visits with Mother, including N.H. not eating or sleeping and hiding when it was time for the visits because he did not want to go.

[13] The DCS family case manager Caitlin Jackson (FCM Jackson), testified although Mother participated in services, she was not able to retain that information due to her cognitive limitations and was not able to progress to safely parent the Children. FCM Jackson added that the Children were thriving in their current placement, and their caregivers were able to properly care for their medical needs and were willing to adopt them. She ultimately concluded that the continuation of the parent-child relationship was not in the Children's best interest. The court appointed special advocate Brenda Parker (CASA Parker) testified that Mother had no housing, did not know the extent of the

Children's medical needs, and did not follow doctor's recommendations regarding the Children's medical needs. She likewise believed that the conditions leading to the Children's removal would not be remedied because during the two years the Children had been out of the home, Mother "continually exhibit[ed] the inability to care for the children, either through unwillingness or through her cognitive disabilities." (Tr. Vol. II, p. 190). She added that Mother had been "very combative" during the CHINS case and had been discharged from many service providers. (Tr. Vol. II, p. 195). CASA Parker equally testified that termination of parental rights was in the Children's best interest, and she indicated that the foster parents were willing to adopt the Children. On September 23, 2019, the trial court entered its Order, terminating Mother's parental rights to the Children.

[14] Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## A. *Standard of Review*

[15] Mother's challenge on appeal is limited to the trial court's decision that the termination of her parental rights was in the Children's best interest. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v.*

*Granville*, 530 U.S. 57, 65 (2000)). However, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* If "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (quoting *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 623 (Ind. Ct. App. 2006)).

[16] Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that support the trial court's judgment, and we accord deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.*

## B. *Termination of Parental Rights*

[17] In order to terminate a parent's rights to his or her child, DCS must prove:

> (A) that one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6)

months under a dispositional decree.

* * * *

(iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to be highly probable." *Id.*

[18] When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester,* 839 N.E.2d at 147.

We determine whether the evidence supports the findings and whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *cert. denied* 534 U.S. 1161, 122 S. Ct. 1197 (2002).

[19]    Mother does not challenge the findings, so they stand proven. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct."). Instead, Mother's sole challenge is that the trial court erred by concluding that termination of her parental rights was in the Children's best interests.

[20]    Pursuant to Indiana Code section 31-35-2-4(b)(2)(C), DCS must provide sufficient evidence "that termination is in the best interests of the child." In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.S.,* 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). In so doing, the trial court must subordinate the interests of the parent to those of the child. *Id*. The court need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *Id*. Recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id*.

[21] Over the course of the CHINS proceeding, the concerns regarding Mother's ability to properly parent and supervise her children became evident. At the onset of the CHINS case, K.M. was diagnosed with failure to thrive and required a G-Tube for feeding, which he may need for the rest of his life. Due to the G-Tube, there were specific instructions on how to feed K.M. and Mother was trained on how to administer his feedings. Mother did not understand or retain enough information from those training sessions to properly feed K.M. On other occasions, Mother disregarded K.M.'s dietary restrictions and would try to feed him solids, insisting "that's what he needed at the time." (Tr. Vol. II p, 133). Mother also acknowledged that she struggled to bond with K.M. who was removed from her care soon after he was born. As for N.H., he increasingly began displaying negative behavior following his visits with Mother. N.H. was not sleeping well, did not want to attend the visits, and would cry, scream, and hide when it was time for the next visit. In addition, N.H., who also struggled with weight gain, refused to eat and he started losing weight.

[22] CASA Parker stated that Mother's "cognitive disability" prevented her from fully understanding the Children's medical issues, and at times, "she [was] unwilling to follow doctor's orders on ways to treat her children." (Tr. Vol. II, p. 191). CASA Parker was concerned that the continuation of the parent-child relationship would be harmful to K.M. since Mother had undergone training on how to feed K.M., but Mother had never been certified to feed K.M. on her own and would require a third party to help her feed K.M. FCM Jackson also

testified that the Children were thriving in their current placement and their caregivers were able to properly address their medical needs. She ultimately concluded that the continuation of the parent-child relationship was not in the Children's best interests since Mother "hasn't understood the ability to appropriately parent her children and . . . the children wouldn't thrive in her care without her understanding." (Tr. Vol. II, p. 157).

[23] We will reverse a termination of parental rights only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). Although Mother attended nearly all supervised parenting time sessions, Mother's parenting skills never improved. Both CASA Parker and FCM Jackson testified Mother was unable to understand the Children's medical needs and provide proper care without continuous intervention, and that it was in the best interests of the Children to terminate Mother's parental rights. Mother was also homeless at the time of the termination hearing, raising concerns of housing instability. Based on the totality of the evidence, we cannot say that the trial court's termination of Mother's parental rights to the Children was clearly erroneous. Thus, we decline to set aside the termination Order.

## CONCLUSION

[24] Based on the foregoing we conclude that DCS presented sufficient evidence to support the trial court's Order terminating Mother's parental rights to the Children.

[25] Affirmed.

[26] Mathias, J. and Tavitas, J. concur